**REGENT PARTNERS, INC., Plaintiff,**

v.

**PARR DEVELOPMENT CO., INC. and Ronald Parr, Defendants.**

No. 95 CV 144.

United States District Court, E.D. New York.

April 17, 1997.

Daniel J. O'Neill, Leily Lashkari, Walter, Conston, Alexander & Green, P.C., New York City, for Plaintiff

Benjamin Greshin, Greshin, Ziegler & Pruzansky, Smithtown, New York, for Defendants.

## OPINION AND ORDER

GERSHON, District Judge:

Plaintiff Regent Partners, Inc. ("Regent") brings this action for breach of contract and account stated against defendants Parr Development Company, Inc. ("PDC") and Ronald Parr under this Court's diversity jurisdiction. Regent seeks reimbursement for payments it made to a third party in connection with a failed real estate development transaction. Discovery has been completed, and Regent now seeks summary judgment against PDC. As will be seen, there is no dispute between the parties as to the existence of a contract or its terms. Rather, the central question is whether PDC can establish issues of fact as to its affirmative defenses of duress and oral modification of the contract.

## FACTS

Except as otherwise indicated, the following facts are undisputed. Both Regent and PDC are real estate development firms. Regent is a Georgia corporation with its principal place of business in Atlanta, and PDC is a New York corporation with its principal place of business in Ronkonkoma, New York. David Allman is the president of Regent, and Ronald Parr is the president and sole shareholder of PDC.

### A. The Rise and Fall of the Olympus Project.

This case arises from the parties' efforts to build a new corporate headquarters building for Olympus America, Inc. ("Olympus"), a large firm primarily engaged in the manufacture of photographic equipment. Mr. Parr and PDC had been successful in interesting Olympus in a Melville, Long Island site for the building. However, in early 1993 it became apparent that the originally contemplated funding for the project would not be available and that alternate sources of capital would be needed in order to develop the Melville site. Mr. Parr thus began a widespread search for additional financing. Eventually he was referred to Regent and, on April 28, 1993, Regent and PDC entered into a "letter of intent" regarding the financing of the Olympus project. Pursuant to this agreement, PDC was to remain as the "lead developer" on the Olympus project while Regent was to obtain funds for the project in the form of a letter of credit or a construction loan.[1]

Regent was successful in attracting the interest of at least two banks in the Olympus project. One of these was the New York office of a German bank, Westdeutsche Landesbank Girozentrale ("WestLB"). The dispute between the parties arises from conditions laid down by WestLB in a June 9, 1993 letter to both Regent and PDC before WestLB would consider issuing a letter of credit for the Olympus project.

The condition relevant to this case provided that Regent and PDC would both "be responsible for all out of pocket expenses we incur in connection with this transaction whether or not the transaction closes." A term sheet attached to the letter provided

---

1. Mr. Parr characterizes the terms of the April 28, 1993 letter of intent as "unfair" and states that he signed it only because "(a)s a mature businessman, I have learned to take half a loaf when I must." Parr Aff. at ¶ 20. However, as will become clear, I need not analyze the terms of the letter of intent or the circumstances of its creation because neither of these are at issue on this motion.

that out of pocket expenses would "include but not be limited to legal fees and expenses, engineering consultants ..., environmental audit, appraisal, and other customary items." WestLB required that both Regent and PDC accept the provisions of the term sheet and both did: Mr. Allman signed the term sheet for Regent on June 21, 1993, and Mr. Parr signed for PDC the following day.

Shortly thereafter, the Olympus project ran into a sea of troubles. During the first half of July 1993 two lawsuits were filed by local residents and municipal officials challenging the construction of the new corporate headquarters in Melville. All of the principals involved in the project recognized that the lawsuits cast serious doubt upon the chances that the transaction would close in August 1993, as originally scheduled.

"As a result of the continued uncertainty with regard to whether the project could close ... Regent [became unwilling] to incur the costs and expenses associated with paying the required structuring fees and out-of-pocket expenses to WestLB without an agreement by Parr Development to reimburse Regent for its costs and expenses if the project failed to close." Allman Aff. at ¶ 14. Accordingly, on July 14, 1993 Mr. Allman sent a proposed letter agreement via facsimile to Mr. Parr. Stating that "Regent is unwilling to incur" WestLB's costs and expenses, the letter set forth the following terms with respect to the payment of those fees:

> In consideration of Regent's agreeing to continue efforts to consummate the [Olympus] Transaction, you have agreed, and this letter shall confirm that you hereby agree, that if the Transaction between Regent and Parr shall fail to close, then you will reimburse Regent, as herein provided, all direct out-of-pocket costs and expenses that Regent is required to pay [WestLB] in connection with its efforts to consummate the Transaction....

Mr. Parr signed the letter agreement on behalf of PDC on July 14, 1993 without making any changes to the text of the agreement. He returned the signed document to Mr. Allman via facsimile on the same day. There is no claim by PDC that Regent did not

continue its efforts on behalf of the Olympus project after the July 14, 1993 agreement was executed.

As it happened, the apprehensions engendered by the lawsuits filed against the Olympus project were well-founded. The August 1993 closing date was not met, and, on September 2, 1993, the president of Olympus wrote to Mr. Parr to inform him that the firm had decided to abandon the Melville development and seek another site for its new headquarters.

In response to this news, PDC attempted to enlist Regent's aid in interesting WestLB in providing financing for the possible development of another site on Long Island for the Olympus headquarters building. Specifically, on September 28, 1993 Guy Germano, PDC's Executive Vice President and General Counsel, wrote to Mr. Allman requesting that Regent approach WestLB in order to get WestLB to sign a letter declaring their willingness to finance construction at an alternate site. The record does not disclose whether or not Mr. Allman contacted WestLB but, in any event, the development of another Long Island site did not occur.

**B. The Aftermath.**

By February 1994, Regent had paid $134,450.00 to WestLB to reimburse the bank for fees and expenses it had incurred in 1993 with respect to the Olympus project. These charges included financing fees, as well as legal and consulting fees. Summarized below are four communications sent by Regent or its agent to PDC seeking reimbursement:

1. In a letter of November 8, 1993 to Mr. Germano of PDC, Regent enclosed copies of invoices from WestLB for fees and expenses in the amount of $146,946.24 and requested reimbursement "pursuant to our agreement with you."

2. On June 23, 1994 Regent wrote to Mr. Parr seeking reimbursement in the amount of $134,450.00, the reduced figure being accounted for by the agreement of WestLB's outside counsel to write off certain of its charges. The fees and expenses incurred by WestLB were itemized and Regent again reminded PDC of the July

14, 1993 letter agreement in which "you agreed to reimburse Regent Partners, Inc. upon demand the amount of all third party direct costs and expenses."

3. Regent then turned the matter over to its outside counsel. On August 24, 1994 its law firm wrote to Mr. Parr by certified mail. Mr. Parr was yet again reminded that "you agreed to reimburse Regent for all direct out-of-pocket cost [*sic*] and expenses Regent incurred in connection with negotiating the terms of a credit facility" for the Olympus project.

4. Regent's law firm wrote to Mr. Parr by certified mail a final time on October 6, 1994. This time, Mr. Parr was informed emphatically that the reimbursement obligation was "personal, absolute, uncontroverted, immediate and without excuse." Further, the filing of suit was threatened in ten days of the date of the letter if payment were not received.

PDC made no written response to any of these four communications. Regent filed this lawsuit on January 11, 1995.

### C. The Contentions of the Parties.

Regent's position is simple. It asserts that on July 14, 1993 Regent and PDC entered into a valid and enforceable agreement pursuant to which PDC would reimburse Regent for payment of WestLB's costs, in consideration of which Regent would continue its efforts on behalf of the Olympus project. PDC has never repudiated the agreement; on the contrary, PDC "continued to receive and enjoy the benefits provided by Regent's performance well after" the date of the agreement. Allman Aff. at ¶ 22. PDC, Regent claims, has thus breached the agreement and summary judgment is appropriate because there is no factual dispute as to any defense to its enforcement.

PDC's position is twofold. First, it argues that it entered into the reimbursement obligation under duress. Specifically, PDC asserts that, immediately upon receipt of the July 14, 1993 letter agreement, Mr. Parr telephoned Mr. Allman to protest that the letter agreement amounted to a demand by Regent for "insurance against losing a penny on the deal without giving any assurance that it would accomplish anything" with respect to the Olympus project. Parr Aff. at ¶ 27. According to Mr. Parr, Mr. Allman responded that, "without the guarantee the joint venture was over and that he had to have my signed agreement, by fax, by the end of the day if I didn't want the plaintiff to cancel by the end of the day." Parr Aff. at ¶ 28. Mr. Parr states that, because the August closing deadline was looming on the horizon, and because he had already devoted more than $2 million to the project, he "had no recourse" but to sign the July 14, 1993 agreement. Parr Aff. ¶ 32. His signature was thus extracted by "economic coercion, nakedly expressed." Parr Aff. at ¶ 28.

Second, PDC claims that the reimbursement obligation has been rescinded in exchange for valid consideration pursuant to an oral agreement between the parties. It asserts that Mr. Parr and Mr. Allman met "a number of times" after July 14, 1993—no specific dates are given—and that during these meetings Mr. Parr complained that the reimbursement obligation was unfair and would not be paid. Parr Aff. at ¶ 36. PDC claims that, in response, Mr. Allman assured Mr. Parr that the matter should not be a point of contention between them because "we could work things out in another transaction." *Id.*

PDC asserts that the parties did in fact "work things out" on two subsequent deals. First, Mr. Parr asserts that PDC undertook to revive the Olympus project at another location after the Melville site had been abandoned and that Regent "was eager to help me, despite my clearly stated intention not to reimburse its WestLB payments." Parr Aff. at ¶ 37. Secondly, PDC asserts that Mr. Parr later, on an unspecified date, introduced Mr. Allman to a Mr. Fortunoff, who was investigating the possibility of building a shopping center. This project never got off the ground, Mr. Parr claims, because Regent "fumbled around too long." Parr Aff. at ¶ 38.

### DISCUSSION

### A. Summary Judgment Standard.

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment should be

granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The standards for granting summary judgment are well known. It is the movant's burden to demonstrate the absence of any genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970).[2] A material fact is one whose resolution would "affect the outcome of the suit under governing law," and a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *see also Celotex v. Catrett*, 477 U.S. 317, 322–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552. Finally, "all justifiable inferences" from the factual record before the court are to be drawn in favor of the non-movant. *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513.

It is not disputed that the terms of the contract at issue are unambiguous and that, under the contract, PDC is obligated to reimburse Regent for WestLB's fees and expenses. At issue are PDC's two affirmative defenses, duress and oral modification. As to each, PDC has the burden of proof, and summary judgment is appropriate unless PDC is able to present sufficient evidence to raise a material issue of fact as to each element of one or more of its defenses. *See,*

*e.g., Continental Airlines, Inc. v. Lelakis*, 943 F.Supp. 300, 307–08 (S.D.N.Y.1996); *Industrial Recycling Sys., Inc. v. Ahneman Assocs., P.C.*, 892 F.Supp. 547, 550 (S.D.N.Y. 1995).

## B. Governing Substantive Law.

Since this is a diversity action, the Court applies the choice of law rules of the state in which it sits in order to determine which state's substantive law governs the disposition of this motion. *Klaxon Co. v. Stentor Elec. Manufacturing Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). Applying the familiar rule of *Babcock v. Jackson*, 12 N.Y.2d 473, 481, 240 N.Y.S.2d 743, 191 N.E.2d 279 (1963), which mandates that the substantive law of the jurisdiction with the "greatest concern with the specific issue in the litigation" governs, it is clear, as both parties assume, that New York law governs this dispute involving a contract entered into by New York and Georgia entities and relating to a New York real estate transaction.

## C. Duress.

Under New York law, a contract may be set aside on grounds of duress when

> the party making the claim was forced to agree to it by means of a wrongful threat precluding the exercise of his free will. The existence of economic duress or business compulsion is demonstrated by proof that immediate possession of needful goods is threatened or ... by proof that one party to a contract has threatened to breach the agreement by withholding goods unless the other party agrees to some further demand. However, a mere threat by one party to breach the contract by not delivering the required items, though wrongful, does not in itself consti-

2. In order to assist the Court with the determination as to whether the moving party has met its burden in this regard, Local Civil Rule 56.1 of this District (formerly Rule 3(g)) provides that the non-movant must submit a "concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried." Under Rule 56.1, it is the non-movant's burden "to identify not only the facts that it alleges are disputed, but to direct the Court to that part of the record ... that supports its view of the facts." *U.S. v. Pilot Petroleum Assocs., Inc.*, 122 F.R.D. 422, 423 (E.D.N.Y.1988). As Regent correctly points out, PDC's submission pursuant to Rule 56.1 is seriously deficient in that PDC "merely has recited its own rendition of undisputed facts and has failed to submit a counterstatement of material facts that it believes are in dispute." Plaintiff's Reply Brief at 3.

tute economic duress. It must also appear that the threatened party could not obtain the goods from another source of supply and that the ordinary remedy of an action for breach of contract would not be adequate.

*Austin Instrument, Inc. v. Loral Corp.*, 29 N.Y.2d 124, 130–31, 324 N.Y.S.2d 22, 272 N.E.2d 533 (1971).

■ The burden of establishing a defense of duress rests with PDC, and it is a "heavy" one. *Int. Halliwell Mines, Ltd. v. Continental Copper & Steel Indus., Inc.*, 544 F.2d 105, 108 (2d Cir.1976). A defense of duress cannot be sustained by a contracting party who has simply been bested in contract negotiations by the "hard bargaining" of another contracting party. *U.S. West Financial Services, Inc. v. Tollman*, 786 F.Supp. 333, 340 (S.D.N.Y.1992), even when the hard bargainer knowingly takes advantage of his counterpart's difficult financial circumstances. *Du-Fort v. Aetna Life Ins. Co.*, 818 F.Supp. 578, 582 (S.D.N.Y.1993). This is especially so "where the parties are very experienced in their field of expertise, as with, for example, very experienced real estate operators." 22 N.Y.Jur.2d, *Contracts*, § 132 at 165 (1996) (citing *Welford Realty, Inc. v. Brause*, 93 A.D.2d 758, 461 N.Y.S.2d 317 (1st Dept), *aff'd.*, 60 N.Y.2d 623, 467 N.Y.S.2d 352, 454 N.E.2d 935 (1983)). That the party seeking to make out a defense of duress had access to "competent and knowledgeable counsel" at the time it entered into the disputed contract makes it still more difficult to "demonstrate the element of compulsion necessary to a finding of duress." *First Nat. Bank of Cincinnati v. Pepper*, 454 F.2d 626, 634 (2d Cir.1972).

■ Finally, even if one executes a contract under duress, the contract is not void, but merely voidable. That is, New York law requires more from the victim of duress than proof of its acquiescence. Rather, "a party who fails promptly to disaffirm a contract entered into under duress is deemed to have waived its right to disaffirm or to have elected to affirm it." *Teachers Ins. & Annuity Ass'n of America v. Wometco Enterprises, Inc.*, 833 F.Supp. 344, 348 (S.D.N.Y.1993).

### D. PDC's Claim of Duress.

■ Mr. Parr, who executed the July 14, 1993 agreement on behalf of PDC, is admittedly a sophisticated businessman. Indeed, Mr. Parr proclaims that his many years of experience have allowed him to learn "construction and development from the bottom up, every phase of the industry," Parr Aff. at ¶ 4, and he describes himself as "a mature businessman." Parr Aff. at ¶ 20. Mr. Parr also acknowledges that he had access to the advice of counsel at the time he executed the July 14, 1993 agreement, but chose not to consult with counsel before executing it because "(t)he facts were plain and I didn't need a lecture on the law.... Common sense and forty years of business experience were enough." Parr Aff. at ¶¶ 39–40.

PDC falls far short of meeting its burden of showing there is a fact issue as to duress. To understand why, it is illuminating to compare this case with the decision of the New York Court of Appeals in *Austin Instrument, supra*, which PDC correctly refers to as the "fountainhead" of the law of duress in New York. Defendant's Brief at 5.

In *Austin Instrument*, the defendant Loral had entered into a $6 million contract with the U.S. Navy to produce radar sets. Loral in turn entered into a contract with Austin pursuant to which Austin would produce all precision gear components needed for the radar sets. Before the first contract was completed, Loral was awarded a second Navy contract for additional radar sets, but informed Austin that it planned to contract with firms besides Austin for the provision of precision gear components.

Austin's response was retaliatory. First, it informed Loral that it would cease deliveries of components under the first contract unless Loral 1) agreed to substantial price increases for the components called for by the first contract and 2) agreed to make Austin the sole supplier for components called for by the second contract. Shortly thereafter, Austin in fact stopped delivery under the first contract, leaving Loral without necessary parts mere months before it was scheduled to ship completed radar sets to the Navy.

Loral did not accede to Austin's demands until it had conducted a fruitless search for other suppliers. It then responded in a letter that can be fairly characterized as a surrender:

> We have feverishly surveyed other sources of supply and find that because of the prevailing military exigencies, were they to start from scratch as would have to be the case, they could not even remotely begin to deliver on time to meet the delivery requirements established by the Government.... Accordingly, we are left with no choice or alternative but to meet your conditions.

29 N.Y.2d at 129, 324 N.Y.S.2d 22, 272 N.E.2d 533.

Loral went on to fulfill its two Navy contracts using Austin components, but three days after completing work on the second contract, it informed Austin in writing of its intention to seek recovery for the price increases paid to Austin under the first contract.

On Loral's counterclaim for recovery of the price increases, the Court of Appeals held that "Austin's threat—to stop deliveries unless the prices were increased—deprived Loral of its free will," 29 N.Y.2d at 131, 324 N.Y.S.2d 22, 272 N.E.2d 533, because Loral was facing a strict impending deadline for delivery of radar sets to the Navy and could ill afford to default on a contract with so major a customer of the firm. The Court held that there was "no doubt" that Loral met its burden with respect to attempting to secure parts from another supplier because "Loral contacted all the manufacturers whom it believed capable of making these parts, and this was all the law requires." *Id.* at 133, 324 N.Y.S.2d 22, 272 N.E.2d 533 (citation omitted). This in turn demonstrated that Loral had no adequate judicial remedy if it refused to yield to Austin's threat: the firm needed parts that only Austin could provide within time constraints that Loral could not amend. Finally, the Court considered that "one who would recover moneys allegedly paid under duress must act promptly to make his claim known." *Id.* Loral had met this requirement because it had promptly informed Austin in writing both that it was

acceding to their threat because it had no alternative and then, three days after the Navy contracts had been fulfilled, that it intended to seek recovery for the price increases. In sum, the Court of Appeals concluded that Loral had made out "a classic case" of duress. *Id.* at 131, 324 N.Y.S.2d 22, 272 N.E.2d 533. For the reasons set forth below, PDC cannot make out a claim of duress under the holding of *Austin Instrument.*

### 1. The Absence of a Wrongful Threat.

Austin made an unambiguous threat; it told Loral to accede to its demands or the shipment of gear components required by Austin's most important customer would stop. Here, Regent's demand was set forth in far less urgent terms. The July 14, 1993 agreement does not contain a threat by Regent to immediately abandon its efforts on the Olympus project. Rather, it states that since it "is unwilling" to assume WestLB's fees in light of the growing uncertainty surrounding the project, Regent would require "consideration" in order to "continue efforts to consummate" the project.

However, PDC claims that an immediate threat was delivered orally by Mr. Allman in a telephone conversation initiated by Mr. Parr upon the latter's receipt of the July 14, 1993 agreement. The sole evidence for this assertion is Mr. Parr's assertion that the threat was made. Uncontested facts in the record conclusively rebut the assertion.

First, Mr. Parr executed the July 14, 1993 agreement on behalf of PDC and returned it to Regent without amendment or written comment of any kind, either before or after execution. On the contrary, PDC continued to enlist Regent's aid in reviving the Olympus project at another site after Olympus had informed PDC that construction would not go forward at the Melville location.

Second, PDC made no written response of any kind to no fewer than four written communications from Regent seeking reimbursement for Regent's payment of WestLB's fees. Thus, PDC never made any effort to memorialize what it alleges to be Regent's wrongful threat despite being repeatedly re-

minded of the reimbursement obligation that it says was the product of that threat. Indeed, it is not contested that there has been no document produced in this case, whether external communication or internal memorandum, from PDC's files or Regent's, that records any expression by Regent to the effect that PDC had to execute the July 14, 1993 agreement by the close of that day's business or Regent would immediately cease its efforts with respect to the Olympus project.

In addition to the lack of evidence that PDC acted in a manner consistent with its feeling threatened, there is also a lack of evidence that the supposed threat was unlawful. In *Austin Instrument,* Austin's threat to breach was backed up a demand that was itself unlawful. It unilaterally demanded both the modification of the price terms that the parties had previously bargained for and that it remain Loral's exclusive supplier when Loral had already announced its intention to contract with other suppliers. 29 N.Y.2d at 129, 324 N.Y.S.2d 22, 272 N.E.2d 533. Here, in contrast, before the July 14, 1993 letter was sent to PDC, there was no contractual arrangement, as between Regent and PDC, regarding the payment of WestLB's fees. Regent and PDC had both promised WestLB in writing to be jointly liable for the entirety of those fees.[3] Once both had contracted with WestLB to pay its fees, there was nothing unlawful in Regent then seeking an agreement under which PDC would be responsible to Regent for payment of the bank's fees if the project failed. As a matter of law, "a negotiating demand [made] by an adverse party cannot be a sufficient predicate for a claim of duress." *Kozera v. Electrical Contractors, Local 501,* 714 F.Supp. 644, 651 (S.D.N.Y.1989), *rev'd in part on other grounds,* 909 F.2d 48 (2d Cir. 1990), *cert. denied,* 498 U.S. 1084, 111 S.Ct. 956, 112 L.Ed.2d 1044 (1991).

---

**3.** PDC argues that there was an unwritten understanding to the effect that Regent would be solely responsible for the payment of WestLB's fees. It relies upon the following excerpt from Mr. Allman's deposition testimony:

Q. The resolution of the fee arrangements was between the bank and Regent, wasn't it? The fee arrangement was between the bank and Regent, wasn't it?

### 2. The Failure to Contact Other Sources of Capital.

As to PDC's efforts to contact other firms in order to obtain a letter of credit, PDC asserts that there was insufficient time "to get a commitment from a new bank before closing on financing, in accordance with the deadline set by Olympus, August 15, 1993." Parr Aff. at ¶ 32. Although this assertion is not supported in any way by PDC, it is not challenged by Regent. Nor does either party address whether, if there were a wrongful threat, PDC had an adequate remedy at law if it refused to sign the July 14, 1993 agreement. However, even if these issues are treated as raising issues of material fact, PDC's failure to raise an issue of fact on the other elements of its defense requires entry of summary judgment.

### 3. The Failure to Repudiate the Contract.

An essential element of PDC's claim of duress is that it "act[ed] promptly to make [its] claim known." *Austin Instrument,* 29 N.Y.2d at 133, 324 N.Y.S.2d 22, 272 N.E.2d 533; *see also Int. Halliwell Mines, Ltd. v. Continental Copper & Steel Indus., Inc.,* 544 F.2d at 108. There is simply no evidence that PDC did this. In stark contrast to Loral which informed Austin of its intent to sue upon a claim of duress within three days of fulfillment of its Navy contracts, PDC stood silent over the course of eleven months during which it received four written demands for payment from Regent.

Mr. Parr explains PDC's failure to raise the issue of duress with Regent by asserting that as, "a matter of personal style," he does not "write letters of protest." Parr Aff. at ¶ 41. Mr. Parr declares that he is "willing to be unusual" in this regard because he has

A. I think the bank looked to us, but they did ask both organizations to support that.
Allman Deposition at 103. This statement does not demonstrate the existence of the unwritten understanding that PDC seeks to establish. On the contrary, nothing in the statement contradicts the unambiguous terms of the June 14, 1993 letter pursuant to which PDC and Regent together agreed to reimburse WestLB's fees.

"had a fair degree of success in life following [his] own precepts." *Id.* This may very well be so, but an assertion of "personal style" is no defense to summary judgment. As a matter of law, "[a] party who fails to promptly challenge an agreement on the ground of duress waives the defense." *Acquaire v. Canada Dry Bottling,* 906 F.Supp. 819, 828 (E.D.N.Y.1995).

In sum, PDC does not raise evidence sufficient to demonstrate the existence of disputed issues of fact as to 1) whether it entered into a contract because of a wrongful threat that deprived it of its free will and as to 2) whether such contract was promptly disavowed by PDC. PDC's defense of duress must therefore fail.

### E. PDC's Claim of Modification.

█ PDC also claims that, after the July 14, 1993 agreement was signed, it was modified so as to release PDC from any obligations under it. Specifically, PDC claims that Mr. Parr met with Mr. Allman "a number of times" after the agreement was executed and that "each time" Mr. Allman told Mr. Parr "not to be concerned" about PDC's obligation to reimburse Regent for the payment of WestLB's fees because the parties "could work things out in another transaction." Parr Aff. at ¶ 36.

PDC attempts to support the existence of a modification by claiming that the parties did in fact seek to work things out. He states that 1) PDC attempted to revive the Olympus project at another site after the Melville site was abandoned and 2) PDC involved Regent in Mr. Fortunoff's failed shopping center development. Thus, concludes PDC, summary judgment is inappropriate because "there is reasonable ground for a jury to conclude that the agreement of July 14, 1993 was rescinded by the parties' subsequent behavior." Defendant's Brief at 12.

█ Regent's argument that the parole evidence rule bars PDC's defense is not correct. "The parole evidence rule bars extrinsic evidence of a *prior or contemporaneous* oral agreement when offered to contradict, vary, add to, or subtract from the clear and unambiguous terms of a valid, integrated written instrument." *Congress Financial Corp. v. John Morrell & Co.,* 790 F.Supp. 459, 468 (S.D.N.Y.1992) (emphasis supplied). However, a written contract may be modified by a subsequent oral agreement "as long as it contains no provision forbidding oral change." *Andreasen, Inc. v. Orly Int., Inc.,* 1990 WL 104020 at *7 (S.D.N.Y. July 17, 1990) (citing cases); *see also* 22 N.Y.Jur.2d, *Contracts,* § 476 (1996). The July 14, 1993 agreement contains no such provision.

However, an unsupported assertion that a contract was orally modified cannot serve to defeat summary judgment when such an assertion is otherwise rebutted by the record before the court. Thus, in *Dombrowski v. Somers,* 41 N.Y.2d 858, 393 N.Y.S.2d 706, 362 N.E.2d 257 (1977), the New York Court of Appeals held that no oral contract existed in a situation where a decedent allegedly told the plaintiff he would "take care of" her in his will in consideration for the provision of housekeeping and related services. Although three witnesses testified that the statement had been uttered, the Court of Appeals still found no oral modification because none of these witnesses could recall a specific date on which the statement was purportedly made and a claim based on the statement was not made against the decedent's estate until eighteen months after his death. Thus, "in the context of this record," the purported statement was held to be "too vague to spell out a meaningful promise." 41 N.Y.2d at 859, 393 N.Y.S.2d 706, 362 N.E.2d 257.

Here, the phrase upon which an oral contract is premised is Mr. Allman's alleged statements (made on unspecified dates) that the parties "could work things out." The making of this statement is supported only by Mr. Parr's bare assertion and is strongly rebutted by the parties' subsequent conduct. Even though an effort was made to revive the Olympus project, and even assuming that the dealings with Mr. Fortunoff took place, there is nothing in the record to support the contention that these events occurred as a result of the parties' desire to "work things out" and thereby retire PDC's reimbursement obligation. On the contrary, the docu-

mentary record includes no fewer than four demands from Regent to PDC for reimbursement and no assertion by PDC in response that an oral modification was entered into by the parties. Therefore, as a matter of law, PDC's claim respecting an oral modification of the July 14, 1993 agreement must fail. *See, e.g., Philips Credit Corp. v. Regent Health Grp., Inc.,* 953 F.Supp. 482, 516 (S.D.N.Y.1997) (finding no oral contract between plaintiff lender and defendant developer where evidence established that defendant was still considering use of lenders other than plaintiff at time that oral contract purportedly existed; summary judgment granted). *Compare Young v. Zwack, Inc.,* 98 A.D.2d 913, 914–15, 471 N.Y.S.2d 175 (3d Dept 1983) (trial court's finding that oral modification of contract existed was reasonable where supported by evidence of parties' conduct subsequent to execution of written instrument).

## F. Summary Judgment Against PDC.

A party seeking to defeat summary judgment must demonstrate that "the evidence is such that a reasonable jury could return a verdict" in its favor. *Anderson v. Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. at 2510. "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Services, Inc.,* 22 F.3d 1219, 1224 (2d Cir.1994). Viewed in the context of the governing substantive law, the evidence with respect to both PDC's defense of duress and its claim that its reimbursement obligation was rescinded "is so one-sided that [Regent] must prevail as a matter of law." *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512. Even though I must draw all "justifiable inferences" from the record in PDC's favor, *id.* at 255, 106 S.Ct. at 2513, there are no inferences that can be drawn here that would support the denial of summary judgment.

In sum, no reasonable jury could find that Mr. Parr's will was overborne and that his signing of the agreement was done under duress. On the contrary, the only reasonable view of the evidence is that Mr. Parr chose not to consult with counsel, who could have advised him of his options and the availability of remedies, but, relying on his own expertise and years of business experience, chose to sign the document submitted to him, without making any effort to negotiate more favorable terms. Similarly, no reasonable jury could find, on the record here, that the obligation PDC incurred, was orally modified.

## G. Account Stated.

Having determined that PDC is liable on the contract, it remains only to consider whether there is an issue of fact as to damages. PDC does not dispute Regent's proof that Regent paid the fees and expenses claimed by WestLB, but argues only that summary judgment is unwarranted because "there is a question of fact as to whether plaintiff made a good faith effort on behalf of Parr Co., as its co-venturer, to get the bank to cancel or reduce its charges." Defendant's Brief at 4. Even assuming that PDC had demonstrated that Regent was obligated to make such an effort, which it has made no effort to do, this argument is without merit. if no objections are raised to an account stated until a claim is asserted in court, then "such belated objections are insufficient to contest the account stated and do not raise a genuine issue of material fact warranting dismissal of a motion for summary judgment." *Polygram, S.A. v. 32–03 Enterprises, Inc.,* 697 F.Supp. 132, 136 (E.D.N.Y.1988) (citation omitted).

## CONCLUSION

Regent's motion for summary judgment against PDC is GRANTED. Regent is directed to inform the Court within ten days of the date of this Order whether it will pursue its action against Mr. Parr. If it will not, the Clerk will be directed to enter judgment against PDC.

**SO ORDERED.**