### GUGEL et al. v. HISCOX et al.

(Supreme Court, Appellate Division, Second Department. April 22, 1910.)

1. WILLS (§ 740)*—CONTRACTS BETWEEN DEVISEES—FRAUD—EVIDENCE.

Evidence *held* to require a finding that a contract by which complainants and their mother were induced to part with advantages conferred by their father's will to defendants, their brothers, was unconscionable, unjust, without consideration, and obtained by defendants through deception and by taking advantage of their superior knowledge of their sisters' ignorance of a business in which the father's property was largely invested and of its value.

[Ed. Note.—For other cases, see Wills, Cent. Dig. § 1891; Dec. Dig. § 740.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

2. CONTRACTS (§ 99*)—ASSENT OF PARTIES—RELATION—UNFAIR ADVANTAGE.

Where the relation between the contracting parties is such that they do not deal on terms of equality, but that either on the one side from superior knowledge of the matters, derived from a fiduciary relation, or on the other from dependence or trust, justifiably reposed, unfair advantage is rendered probable, the transaction is presumed to be void, and the burden is on the stronger party to show affirmatively that no deception was practiced, and all was open, fair, and understood.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. § 448; Dec. Dig. § 99;* Cancellation of Instruments, Cent. Dig. § 102.]

3. WILLS (§ 740*)—CONTRACTS BETWEEN DEVISEES—INVALIDITY—ESTOPPEL.

That plaintiffs did not before signing an agreement and deed by which they released rights under their father's will familiarize themselves with their contents and effect on their rights did not preclude them from thereafter attacking their validity.

[Ed. Note.—For other cases, see Wills, Cent. Dig. § 1891; Dec. Dig. § 740.*]

4. CANCELLATION OF INSTRUMENTS (§ 24*)—RESCISSION—TENDER—WAIVER.

In a suit to cancel certain contracts and deed, on defendants raising the question that plaintiffs were not entitled to relief because they had not tendered a return of benefits received under the instruments, whereupon the court permitted plaintiffs then to make such tender, which they did in open court, and refused to allow the trial to proceed at that term until the exception taken by defendants to the allowance of the amendment was expressly waived, defendants could not thereafter object that plaintiffs were estopped because of the lack of such tender.

[Ed. Note.—For other cases, see Cancellation of Instruments, Dec. Dig. § 24.*]

5. CANCELLATION OF INSTRUMENTS (§ 24*)—CONTRACTS BETWEEN DEVISEES—BENEFITS RECEIVED—NECESSITY OF TENDER.

Where, in an action to cancel a contract and deed by which plaintiffs surrendered certain rights under their father's will, it appeared that they would have been entitled to receive and retain the same benefits under the will that they had received under the contract and deed, they were not bound to return such benefits as a condition to their right to a cancellation of such instruments.

[Ed. Note.—For other cases, see Cancellation of Instruments, Cent. Dig. § 37; Dec. Dig. § 24.*]

6. WILLS (§ 740*)—CONTRACT BETWEEN LEGATEES—EFFECT.

A contract between legatees for the division of mining stock and other property bequeathed to them by testator's will in a different manner was limited to the property immediately affected thereby, and was not effective to set aside the provisions of the will as to other property.

[Ed. Note.—For other cases, see Wills, Cent. Dig. § 1892; Dec. Dig. § 740.*]

Appeal from Special Term, Queens County.

Action by May M. Gugel and another against Everett S. Hiscox and another to cancel and set aside an agreement and deed alleged to have been procured by defendants' fraud and misrepresentation. From a judgment dismissing the complaint, plaintiffs appeal. Reversed and new trial granted, with costs to abide the final award of costs.

See, also, 120 N. Y. Supp. 308.

Argued before HIRSCHBERG, P. J., and WOODWARD, THOMAS, RICH, and CARR, JJ.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Robert F..Manning, for appellants.
Thomas Young, for respondents.

RICH, J.   The following facts are uncontroverted: David Hiscox, the father of the parties, died January 25, 1906, leaving a last will and testament, which was duly admitted to probate, under the provisions of which letters testamentary issued to the defendants.   They qualified, and have since served as executors.   He had for many years been engaged in the manufacture and sale of patent medicines and toilet articles, and owned the trade-marks used in connection with the business, the formulas and recipes under which the medicines were manufactured, the buildings in which the business was carried on, and the ground upon which they stood.   The business at the time of the testator's death was very lucrative, the profits therefrom for the year· preceding his death being $32,000, as stated in the will, which the defendant Jesse F. Hiscox testified should be reduced to $27,000 by payment of salaries, and that the average net profits during the three years prior to his father's death were $28,000 a year.   Under an agreement made with a former copartner, Rawolle, the testator purchased his interest in the business for $180,000, for which he executed and delivered his 240 promissory notes of $750 each, one of which was payable each month, commencing on May 15, 1910.   This indebtedness had been reduced, at the time of the testator's death, to $130,000.   He also was indebted to Dauchy & Co. in the sum of $30,000, which represented a firm indebtedness assumed by the decedent when he bought his copartner's interest in the business.   The obligations resting on the testator under the provisions of this agreement represented practically his indebtedness at the time of his death.   By the terms of his will, he devised his entire estate to his executors, in trust, and directed the defendants to carry on the business as executors, and to each retain from the yearly profits $3,000 for their services, which compensation was based upon. estimated net annual profits of $32,000, and was to be increased proportionately as the profits increased, to pay each year to the widow $4,000, to each of the three daughters—of whom the plaintiffs are two—$1,000, for the support of an incompetent son $1,000 yearly, to one Hughes $2,000, and to apply the balance yearly to the payment of his debts.   These payments were to continue until the debts were paid or both defendants sooner died.   If before that time either daughter died, the $1,000 directed paid to her was directed to be paid to her children.   If the widow died, the $4,000 given her was to be turned over each year to the trust fund, and applied to the payment of such debts.   Upon the payment in full of the debts, or the earlier death of both defendants, the estate was to be distributed one-third to the widow if living, and the balance (if the widow was dead, the whole) to the five children, of whom the parties are four, in equal proportions, with the exception that before the division a fund sufficient to produce an annual income of $1,000 was to be deducted for the benefit of the incompetent son, and such income devoted to. his support.   Upon his death the trust fund so set aside for his benefit was to be divided between the widow and five children in the same proportions as the body of the estate.

The day after their father's death the defendants went to the office of an attorney and caused him to prepare the agreement which it is sought to set aside in this action. The agreement was prepared complete, as executed, with the exception of the date, and a clause providing that it should become binding upon each of the parties of the first part, the widow and daughters, as soon as executed by them or either of them, "notwithstanding the same may not be executed by any other party or parties of the first part," which were inserted later. By its provisions the widow and daughters released to their brothers, the defendants, the business which the husband and father had conducted in his lifetime, together with all patents, trade-marks, copyrights, and the good will of the business, and agreed to execute any further instrument necessary to carry such transfer into effect, and to execute a deed conveying to the defendants the premises upon which the business had theretofore been conducted, together with the buildings thereon "and everything connected therewith." This deed was later executed and delivered, and is also sought to be set aside. The consideration expressed in this instrument was, first, the payment by the defendants to the widow of $4,000 per year, to each of the daughters $1,000 per year "for and during their natural lives, or as long as said business shall remain profitable and in the possession and control of the parties of the second part" (the defendants), to the incompetent $1,000 per year during his natural life; and, second, the assumption and agreement to pay (by the defendants) Dauchy & Co. the balance due them, stated to be about $30,000, the indebtedness owing the estate of Rawolle, stated to be $130,000, "and all other indebtedness of said business of Hiscox & Co." On the day of the funeral the defendants, accompanied by their attorneys, met the widow and daughters at the house of the deceased, and, after the reading of the will, the parties had a conversation with reference to the future. As to the details of this conversation the several witnesses differ. One of the attorneys testified:

"That paper [the agreement] was read and discussed there at the meeting after having read the will and the Rawolle agreement. I then stated the position of the two brothers, Everett and Jesse Hiscox. I said that the two brothers thought that the will as to them was very unfair. I stated that these two brothers said that the will as to them was very unfair; that they had conducted this business for many years; did all the work practically; that their father, while the nominal head of the business, had really done very little in it; that his interests for the past year or two had been more in gold mines and things of that character than it was in the business; that the business had now begun to pay, and that their efforts were what made it pay; that, when they had taken hold of it, this business owed a very large debt. They claimed the credit for having pulled this business out of a very bad financial hole; that they had remained with their father at his urgent and earnest solicitation, when they might have gone out and acquired a standing in the world and been able to obtain each of them a large salary; that they had stayed there with the idea and expectation that at his death this business would be theirs; that they claimed to be the only ones in possession of these formulas. * * * I then stated the suggestion as to the Rawolle indebtedness as to the amount of the Dauchy indebtedness, and said to them that, if this business at the present time were turned over to any one else, it would be a very doubtful proposition whether they could make it pay; that the two brothers Everett and Jesse Hiscox said that they would not go on under the

arrangement provided by the will; that they possessed the only knowledge as to these formulas, and that they would not go on and conduct the business under the arrangement provided by the will; that they would propose an arrangement under which they would go on and conduct the business. I then read the agreement which I had prepared. After reading that agreement, there was a large number of questions by the different ones present and a great deal of discussion. I think that after this discussion it was stated that the parties to the agreement would come to my office. I ·cannot remember whether a day was fixed or not, but within a few days, and execute it. In a few days Miss Daisy Hiscox and her mother and two brothers came to my office. The agreement was read over from start to finish again. I think that Miss Daisy Hiscox asked me during the course of the reading several questions. One question that she asked me I think was as to whether this payment of $1,000 should go to her heirs in case of her death, and it is my recollection— I have not seen the agreement in some time—it is my recollection that I said, 'No.' I don't remember any particular part that she asked about. It was all read over, and my recollection is that Mrs. Hiscox signed it first, and then Miss Daisy, and I took the acknowledgment."

Another witness testified that when the will was read and Mrs. Gugel was present—

"then he read the Rawolle agreement, and then this matter was discussed; the boys stating that they would not proceed under the terms of the will, and would not conduct the business, and would not accept the obligations of the trust mentioned in the will. The proposed agreement, a copy of which is annexed to the complaint, was read in full and portions of it were re-read. * * * Miss Daisy Hiscox asked a number of questions, and I distinctly remember that she inquired about her heirs, whether they would continue to receive the $1,000 per year payable to her as an annuity during her life."

They were asked—

"if they all understood it and if they were satisfied with it, and Mrs. Hiscox, the mother, said she was, and then he turned to Miss Daisy Hiscox, and asked her if she understood it and was satisfied, and she said 'Yes.' I was there only as attorney for the two defendants in this action. * * * It was signed by the two boys and by Mrs. Mary M. Hiscox and Daisy Hiscox."

The defendant Jesse F. Hiscox testified:

"I took the agreement known as 'Schedule A,' annexed to the complaint to my sister Mrs. Gugel, in Long Island City. I heard her testimony on the stand, and was present when she signed the agreement. I had very little conversation with her. All that I remember is that I handed her the agreement, and told her to read it over. She read it, and I asked her if she understood it. She said she didn't know if she understood everything in it. She wanted to know whether it was like the will, or whether the will could not be carried out, and I told her that we didn't care to carry the trust out in the will, and, if we didn't continue the business and the executors took it, there wouldn't be anything. If they were willing to sign some kind of an agreement so we could run the business, why those were the terms we would gladly give them. She said as long as her mother and Daisy had signed it she was perfectly willing to sign it, so I got a notary public and she signed it. * * * I recall the occasion of the meeting of the family at my father's house after his death and the night of the funeral. * * * This agreement annexed to the complaint was then read, * * * parts of it more than once. I don't recollect whether he read the whole thing more than once at that time or not. My brother Everett and I stated there in the presence of the plaintiffs in this suit we wouldn't run the business under the trust in the will, but that, if some kind of an agreement was made between all of the heirs and the executors, we would be willing to continue it, and pay the debts so long as the business was profitable."

122 N.Y.S.—36

The defendant Everett S. Hiscox testified:

"After the funeral, the will was read. After reading the will the Rawolle agreement and this family agreement was read over and discussed. When I say family agreement, I mean the agreement dated January 31, 1906. My brother and I objected to carrying out the trust part of the will, and we refused to carry on the business under that arrangement, because my father made another, arrangement with my brother and I prior to this to carry on the business, transferred it to us. We explained that evening when this Rawolle agreement was made that Mr. Rawolle required my father to provide some way to continue this business to secure his notes. We were named in that agreement. There was a salary of $2,000 a year named in there which we refused to accept as sole compensation for the continuation of the business and the liquidation of his debts. Mr. Rawolle said he must make a conditional will, which he did. * * * Mr. Rawolle required this will made to secure his indebtedness, and my father made it, leaving a certain percentage of any profit which might be over what was due Mr. Rawolle to my sisters and my mother, and transferred the business to my brother and myself, after paying these liabilities. He destroyed that agreement and made this other will. The Court: Did you tell them that? The Witness: Certainly we told them. * * * I told my sisters that as he had transferred the business to us originally, and destroyed the transfer, that we didn't think that we ought to be obliged to carry these additional liabilities which the will put upon us. Therefore we wanted an agreement made with the family whereby we could run the business as owners of it, and take the responsibility of the debts. We told them, if the business went to the creditors, they wouldn't get anything; that, if we took it, they would get a $1,000 a year for the reason that, if we didn't take it, the trust would be dissolved anyway, and the $1,000 in the will only goes to them as long as the trust exists, and then the will states that the business is to be divided. * * * The agreement was all read and gone over, and they all agreed to it at that time. I was present * * * when the agreement was signed. There wasn't anything said by anybody but my mother and sister at that time. My sister asked * * * something about the $1,000 going to her heirs. As near as I can remember, he told her, 'No,' that it would not."

The plaintiff May M. Gugel testified that the agreement was not read on the day of the funeral; that the first she knew of its contents was when her brother, the defendant Jesse, brought it to her to sign. She says:

"My brother handed the paper to me, and said, 'Here is a paper I would like you to sign. Read it through.' I read it over, and he said, 'Do you understand it?' and I said, 'Well I don't know. What is in it anyway?' and he said, 'Well, if the business was to be divided, mother's share would be five-fifteenths, your share would be about two-fifteenths, and you wouldn't be able to get any money for some time.' And he said, further: 'If you sign this paper, you will get payments the same as the will provided and they will be given immediately.' * * * My brother further said that 'mother and Daisy have signed it,' and I said, 'Yes; I guess it is all right,' so he went out and brought back a notary public, and I signed the paper. Q. Did you know anything about the contents of that paper before it was brought to you by your brother? A. No. Q. Did you understand what it meant? A. No; I did not. The Court: You had no counsel? Witness: No; none at all. Q. Had you ever consulted with anybody about this paper? A. No. Q. You signed it immediately when your brother brought it to you upon reading it? . A. Yes, sir. Q. Did you know anything about the business of the Hiscox Chemical Works? A. No; I did not. Q. Your father had never talked to you about it before his death concerning the profits or anything connected with the business? A. No. Q. Were you present the night that your father's will was read in Patchogue? A. Yes, sir. The Court: What did your brother tell you, if anything, about the profits of the business before you signed the agreement? Witness: He didn't say anything about the profits."

One of the attorneys—

"made a suggestion about the business being divided up. They were talking about the business being divided up, and he said he made some suggestion that the boys—that is, my two brothers—thought they were entitled to the business at the end of 25 years, instead of being divided as the will provided. They thought they were entitled to the whole thing."

And said in regard to her signing the deed:

"Q. On April 30, 1906, did you sign a deed to the property? A. I did. Q. Had you said anything prior to this to your sister concerning the signing of that deed? A. I said I didn't think I would sign it, as I had already signed enough papers. Q. Was anything said to you then about the signing of it? A. No; she mentioned it to my brother, and he said, if I didn't sign it, the payments would stop, as I had already agreed to sign it in the agreement."

The plaintiff Daisy E. Hiscox testified that she knew nothing of the agreement or its contents until the day before she signed it, January 31st, when she was informed by the defendants that there was such a paper to sign. She says:

"They told me that the will was void because of the confliction of the two papers—that is, the will and this other paper—and they said that the will was void; therefore I would have— They were going to make out these papers and fix everything all right so they made out these papers and appointed a day for me to sign. * * * Q. You had no legal advice at all? A. None at all. I didn't think it was necessary. Q. Had you talked with anybody concerning the signing of this agreement before you signed it? A. No, sir."

That she knew nothing about the contents of it except that there was some difference between that and the will; that the agreement was read to her, she says—

"as I requested it, as I thought I could understand it better if he read it. I interrupted him several times during the reading of it. I asked him to explain certain parts. He explained them. Q. Did you understand it? A. No; I didn't understand. Q. Did you understand what the whole purport of that agreement was as a matter of fact? A. Not at all. Q. Did you ask him whether there was any difference between that agreement and the will of your father? A. I asked him what the difference was, and he explained it to me. Q. What did he say to you? A. He said it was just the same as the will, except that Mr. Hughes was left out. There was some sort of a compromise made with Mr. Hughes. Q. Did he make any statement concerning any heirs? A. Yes, sir. Mother asked him a question, and his answer was it would go to my heirs, the same as the will. After I had signed the agreement, I asked Mrs. Hughes about it. * * * She told me what the paper contained, and that was the first time that I knew the meaning of what I had signed. I did not believe what she told me concerning it. * * * Q. You have heard the testimony of Mr. Pelletreau and your brothers concerning the reading of this agreement, which we are seeking to set aside, on the night of your father's funeral. Do you remember any such agreement being read? A. It was not read nor talked about. Q. What was read there that night? A. The Rawolle agreement and the will, and then my brothers discussed this other matter. They were displeased with the will. The Court: Did you plainly understand that, if this went through all that you were ever going to get was $1,000 a year while you were living? The Witness: No; I didn't understand. The Court: What did you think you were going to get? The Witness: I thought that I was to receive the same as the will. After the debts were paid, I was to receive an equal share in the business. I understood it to be the same as the will, except that Mr. Hughes was left out of it. I understood there was some sort of a compromise with Mr. Hughes."

Mrs. Hughes did not sign either the agreement or deed.

It is undisputed that in the three years following their father's death the defendants (for the services for which they had been severally paid $2,000 per year in their father's lifetime, and the value of which he placed at $3,000 each per year in his will), in addition to each taking from the income of the business $6,000, which they term wages, divided between themselves practically $100,000; that after payment of this sum and the running expenses there remained as the net profits of the business an average of $9,000 a year; and that the yearly profits are rapidly increasing in amount. No payments have been made or money set aside for meeting the payments provided for by the Rawolle agreement commencing May 1, 1910, and only $20,000 has been paid on the Dauchy claim. Under the guise of increased salaries—increased by themselves—the defendants have concededly withdrawn from the profits of the business and applied to their own use each year $35,000, while the plaintiffs have each received the sum of $1,000 per year. The defendants testify that for many years prior to their father's death they had conducted and managed his business, had accurate and complete knowledge of all matters connected therewith, its condition, earning power, and the large profits it was producing and was capable of producing in the future. It is uncontradicted that their sisters, the plaintiffs, were in absolute ignorance of all of these matters, had no knowledge or information concerning their father's financial affairs or the extent of his estate, that they were at no time informed or in any manner made conversant with such facts, and had no means of knowing whether the business was profitable or unprofitable; that they believed and relied implicitly upon what the defendants told them, reposed great confidence in them, and were induced to and did act as they did because of such confidence, and with no knowledge of the essential facts possessed by their brothers. The agreement was prepared by the defendants without the knowledge of the other members of the family, and without consultation with them. The defendants were represented by two attorneys, while the plaintiffs had none and consulted with no one regarding the matters involved. They were called upon to act at a time when their mental condition was necessarily disturbed and weakened by the death of their father. Their father was unburied when their attention was first directed to the matter, and they were called upon to execute the agreement within a week thereafter. They acted without the benefit of equal knowledge, and it is very apparent that they did not deal on terms of equality with their brothers. They testify that they did not mistrust the agreement because of their reliance upon the statements made them and their confidence in the defendants, and that they supposed and understood that the payments made to them, after the agreement was executed, were made under the will, and not under the agreement, which is not at all improbable; the amounts being the same.

That the agreement was a very unwise, disadvantageous, and, if upheld, a very disastrous one to the plaintiffs, is very apparent. The amount received by the defendants from the profits of the business for the three years following their father's death, as testified to by them, is as follows:

Wages, $2,000 each per year.................................... $ 12,000 00
Salary, together $33,000 per year.............................      99,000 00
In addition to which there was a net yearly profit of $9,000....      27,000 00

   A total of...........................................  $138,000 00

Under the will the defendants would have received $3,-
   000 each per year.............................. $18,000 00
   Increased by increased profits:
In 1906 nothing—profits $27,000.
In 1907, profits $35,000.............................      590 00
In 1908, profits $40,000.............................    1,520 00
                                                       _____
                                                       $20,110 00
The incompetent son would have received...........    3,000 00
Mr. Hughes......................................      6,000 00
The widow until her death.........................   10,000 00
The three daughters $1,000 each....................    3,000 00      48,110 00
                                                       _____
   Leaving ...............................................  $ 89,890 00

to apply upon the debts of the testator, an average of practically $30,-
000 per year.

It would thus appear that this valuable estate might have been distributed by June 1, 1911; for although the $130,000 debt, payable in monthly installments commencing in May, 1910, would not then have been wholly due and payable, the fair presumption is that the creditor would have permitted it to be then paid in full. The plaintiffs would then each have come into possession of one-fifth of the business and plant, after deducting a sum sufficient to produce the yearly income of $1,000 for the incompetent son. It is idle to argue that the business and plant were at the time of the testator's death of little value. Less than six years before he had paid $180,000 for his copartners' interest, and a business capable of producing average yearly net profits $46,000, constantly increasing, with trade-marks, formulas, and recipes of great value, the good will of the business, presumably very large (Matter of Hiscox [Sup.] 120 N. Y. Supp. 308), and the real and personal property forming the plant, constitute a valuable plant and lucrative business. The plaintiffs have each relinquished and transferred to the defendants by the agreement the one-fifth part of this plant and business in consideration of each being paid the same amount directed by the will, $1,000 per year, "for and during their natural lives, or as long as said business shall remain profitable and in the possession and control of the parties of the second part." There is no restriction in the agreement of the right of the defendants to sell the plant and business at any time, and, if they saw fit to do so, by its passing out of their possession and control, the rights of the plaintiffs in the estate of their father, and, under the agreement, against the defendants, would terminate and be absolutely extinguished. It seems to me that the agreement is unconscionable, unjust, and without adequate consideration, and that it was obtained by the defendants through deception and by taking advantage of their superior knowledge and their sisters' ignorance of the business and its value. The court cannot lend its aid to secure to them the enjoyment of benefits obtained through their be-

trayal of the confidence and trust reposed in them by their mother and sisters.

It is difficult to conceive a state of facts more clearly bringing a case within the rule that whenever the relations between the contracting parties appear to be of such a character as to render it certain that they do not deal on terms of equality, but that either on the one side from superior knowledge of the matters derived from a fiduciary relation, or on the other from dependence or trust, justifiably reposed, unfair advantage is rendered probable, the transaction is presumed void, and it is incumbent upon the stronger party to show affirmatively that no deception was practiced and all was open, fair, and understood. Cowee v. Cornell, 75 N. Y. 91, 99, 31 Am. Rep. 428. This rule was considered and applied by this court in Dolan v. Cummings, 116 App. Div. 787, 102 N. Y. Supp. 91, affirmed, without opinion, 193 N. Y. 638, 86 N. E. 1123, and is a controlling authority in the case at bar. This burden the defendants failed to sustain, and the presumption that the agreement and deed were void was not overcome by the evidence. The fact that the plaintiffs did not before signing the agreement and deed familiarize themselves with their contents and effect on their rights under the will does not preclude them from attacking their validity. Albany City Savings Inst. v. Burdick, 87 N. Y. 40; Smith v. Smith, 134 N. Y. 62, 31 N. E. 258, 30 Am. St. Rep. 617; Wilcox v. American Tel. & Tel. Co., 176 N. Y. 115, 68 N. E. 153, 98 Am. St. Rep. 650.

It is contended that the plaintiffs are estopped from attacking the agreement because of their having received and retained the property to which under its provisions they became entitled without tender or return of the same to the defendants or the estate they represent, and the trial court found the existence of the facts involved in the proposition. In making this finding the learned trial justice must have overlooked the fact that upon the trial, and following his statement when the question was raised, "I will allow him to set himself right by offering now to return anything they have received," there was a tender made in open court of everything the plaintiffs had received under the agreement, and the complaint was permitted to be amended accordingly, and that he refused to allow the trial to proceed at that term until the exception taken by the respondents to the allowance of such amendment was expressly waived. Further than this the plaintiffs owed no duty to return the money received, for the reason that they were entitled to receive and retain it under the provisions of the will; the amounts being the same. Kley v. Healy, 127 N. Y. 555, 561, 28 N. E. 593.

There is no merit in the contention that the agreement for and division of the mining stocks and other property between the parties presents an executed agreement to set aside the terms and provisions of the will. In Matter of Hiscox, supra, it was held that, conceding this contention, the agreement should not be extended beyond the property immediately affected thereby, and it has no bearing and constitutes no defense to the plaintiffs' cause of action presented by the record.

The exceptions present reversible error.  The judgment must therefore be reversed and a new trial granted, costs to abide the final award of costs.  All concur.