WBXB, LLC v Rosswaag (2024 NY Slip Op 24285)

[*1]

WBXB, LLC v Rosswaag

2024 NY Slip Op 24285

Decided on November 7, 2024

Supreme Court, Suffolk County

Hudson, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the printed Official Reports.

Decided on November 7, 2024
Supreme Court, Suffolk County

WBXB, LLC, Plaintiff,

against
Gilla Rosswaag, SUSAN LODATO and SKIPPERS COTTAGES LLC, Defendants. 
Gilla Rosswaag, SUSAN LODATO and SKIPPER COTTAGES LLC, Defendants and Third-Party Plaintiffs,
against
Mia Christianson and JOEL CHRISTIANSON, Third-Party Defendants.

Index No. 619437/2018

James Hudson, J.

The bond between a parent and child is so strong that it is an understatement to say it exceeds the constraints imposed on a fiduciary. A fiduciary may have been a stranger to their principal mere moments before the relationship is recognized. The fiduciary's loyalty, though the law recognizes its dignity and enforceability, can be purchased with a few coins. The obligations between a parent and child, however, begin even prior to birth and are truly extinguished only with that final earned repose which ends our earthly existence. (See Blackstone's Commentaries on the Laws of England Book One: Chapter Sixteen: Of Parent and Child). The matter at hand illustrates how this bond cannot be casually set aside. 
The case at bar is an action for specific performance of an option to purchase real property. The allegations in the complaint, answer and counterclaim were set forth in prior orders of the Court which ultimately resulted in a grant of partial summary judgment in [*2]defendant's favor. The affirmance of this Court's decision by the Appellate Division (WBXB, LLC v. Rosswaag, 216 AD3d 1053, 189 NYS3d 670 [2d Dept 2023]) also contained a factual recitation. For the purposes of clarity, the background of this dispute will be repeated from the Court's decision of May 11th, 2020.
Prior to December of 2006 the locus in quo was owned in fee simple by three Tenants in Common, Gilla Rosswaag, her sister Susan Lodato and Mr. Anthony Accetta. Mr. Accetta passed away and his interest came into the possession of his estate. Ultimately his share was conveyed to his daughter Nannette Stanya. There was a dispute between the three co-tenants and litigation ensued. This preceding unrelated lawsuit was settled in 2016 by an agreement with Ms. Rosswaag and Ms. Lodato purchasing the 1/3rd interest of Ms. Stanya. In order to buy out their co-tenant, however, the sisters were each obliged to pay Ms. Stanya the sum of $285,000.00. Ms. Lodato had the necessary funds, but Ms. Rosswaag found herself in need of capital. 
Ms. Rosswaag turned to her daughter and son-in-law, Mia and George Christianson. They agreed to loan her the requisite sum and memorialized this understanding in a written contract on January 10th, 2017 (hereinafter referred to as "The Agreement"). Instead of loaning the money in their personal capacities, the Mr. and Ms. Christianson used a wholly owned company, WBXB, LLC. 
That Agreement set forth that Ms. Rosswaag could continue to reside within the residence at the subject premises during her lifetime, provided - she did not remove herself from the premises for a continuous period of 60 (sixty) days. The terms of that Agreement also gave plaintiff a right to purchase the 50% interest of Ms. Rosswaag ("Purchase Option"). 
The salient language of the Agreement is found in Paragraphs 5,6 and 7:
Agreement Paragraph 5 states:
Gilla [defendant Gilla Rosswaag] does hereby grant unto WBXB the right to purchase her interest in the property, which she represents to be 50% of said ownership, during her lifetime, which purchase during her lifetime shall not affect her right to remain in the property.
Agreement Paragraph 6 states:
she represents to be 50% of said ownership, during her lifetime, which purchase during her lifetime shall not affect her right to remain in the property WBXB shall have the right to purchase that 50% interest for the total sum of $785,485.48 during the lifetime of Gilla [defendant Rosswaag]. The amount of the loan plus accumulated interest shall be deducted from said amount.
Agreement Paragraph 7 states:
WBXB, upon the death of Gilla [defendant Rosswaag], shall have the continuing right to [*3]purchase her interest, free and clear of any and all liens and encumbrances for $785,485.48 and deducting from that the amount of said loan [$285,458.48] and any accrued interest thereon.
After receiving the loan, Ms. Rosswaag and her sister completed their purchase of Ms. Stanya's interest in the property. After receiving the 1/3rd interest, however, Ms. Rosswaag and Ms. Lodato structured their respective 50% ownership by forming an LLC (defendant Skippers Cottages hereinafter referred to as "Skippers"). Thereafter, the sisters executed a deed conveying their respective pre-buyout interests in the subject premises to Skippers as well as Ms. Stanya's former 1/3 interest. 
Upon learning of this arrangement, plaintiff commenced the instant action alleging, inter alia, breach of contract and sought specific performance of the purchase option in the Agreement. Defendants denied the complaint, alleging that the purchase option was void and asserted several defenses, most importantly for the purposes of this discussion, unconscionability. A counterclaim/third-party action for back rent from Mia and Joel Christianson's use of the premises was also asserted. 
In this Court's decision of August 21st, 2020, it was decided that a portion of paragraph 7 violated the Rule against Perpetuities and was thus stricken. In light of the articulated defenses and counterclaim, the enforceability of the purchase option (as amended) was reserved for trial. The counterclaim for back rent was also determined to be fit for resolution by the trier of fact.
The parties appealed and cross-appealed. After considering Appellants and Respondents respective arguments, the Appellate Division affirmed this Court's decision, holding (in relevant part) that:
. . . paragraph 5 of the January 2017 agreement, which provided that the plaintiff shall have the right to purchase Rosswaag's 50% interest in the premises "during [Rosswaag's] lifetime" was of limited duration (see Morrison v. Piper, 77 NY2d at 171, 565 NYS2d 444, 566 NE2d 643; Reynolds v. Gagen, 292 AD2d 310, 739 NYS2d 704), and thus, did not violate the rule against perpetuities.
Although the plaintiff conceded that paragraph 7 of the January 2017 agreement violates the rule against perpetuities, contrary to the defendants' contention, the intent of the agreement can be effectuated without the offending paragraph 7 as the purchase option in paragraph 5 expressly is limited in duration (see Symphony Space, Inc. v. Pergola Props., Inc., 88 NY2d at 482, 646 NYS2d 641, 669 N.E.2d 799; Morrison v. Piper, 77 NY2d at 174, 565 NYS2d 444, 566 NE2d 643). (WBXB, LLC supra at 1056)
After the above affirmation was issued, this Court conducted a non-jury trial to resolve the issue of whether the purchase option was enforceable and whether the defendants' counterclaim/third-party claim for back rent was viable. The Court received the following testimony and exhibits:
Plaintiffs first called Mr. George Christianson to the stand. The Court found him to be in [*4]all respects a forthright and credible witness. He related that the plaintiff, WBXB, LLC is a Pennsylvania Limited Liability Company which was formed by himself and plaintiff member/third-party defendant Mia Christianson. He also stated that Mia Christianson is the wife of the third-party defendant Joel Christianson and third-party defendant Joel Christianson is his son. George Christianson was familiar with the plaintiff Gilla Rosswaag, the mother of Mia Christianson. After giving an overview of the relationship between the parties, the witness described how he was called by Joel and Mia on January 7th, 2017 concerning Gilla Rosswaag's need for funds to purchase half of Ms. Stanya's 1/3rd interest in the locus in quo. Based upon their conversation, the witness (an attorney admitted in our sister state of Pennsylvania) drew up a proposed contract (The Agreement) which contained provisions for a loan and an option to purchase Ms. Rosswaag's enhanced one-half interest contingent on a future event. George's Christianson's testimony was accompanied by the receipt of plaintiff's exhibits 1-7. Thereafter, based on his understanding that Ms. Rosswaag had signed the Agreement, the witness issued two checks totaling $285,495.48 (plaintiff's 6) made payable to David Fallon PLCC, representing the amount agreed to be loaned to Ms. Rosswaag. The witness subsequently learned that Ms. Rosswaag's expected 50% ownership of Skippers never materialized. Instead, the respective ownership interests of Mmes. Rosswaag, Lodato and Stanya were transferred to the defendant Skippers Cottages LLC. On cross-examination, the witness stated that he never spoke with Nanette Stanya, nor did he interact with Susan Lodato. It was noted that Ms. Lodato did not sign any of the documents he prepared. Indeed, the witness interacted exclusively with Joel and Mia and received the final information concerning the proposed transaction solely from his son and daughter-in-law. This left Mr. Christianson (pere's) testimony to be of some limitation.
Michael Teckel was next called by the plaintiff. A notary public, he was present when the plaintiff Mia Christianson brought the Agreement to Gilla Rosswaag for signature. He described a meeting between Mother and Daughter that lasted approximately 30 minutes. Ultimately, he witnessed Gilla Rosswaag sign the Agreement and he then notarized the document. The Court also found Mr. Teckel to be a truthful, but ultimately problematic, witness. 
Mr. Teckel testified (over objection) about the conversation between Mia and Gilla. The salient excerpts from the trial include such language as Mr. Teckel witnessing a "friendly encounter" that lasted approximately "30 minutes" and during which Mia Christianson "produced" the documents and "showed them to her mother." Mr. Teckel testified that Mia was "straightforward" and "going paragraph by paragraph" and that Gilla "understood." Importantly, there were "no threats" and "the daughter was explaining the documents to her mother." (Trial Transcript at 111-118)
The Court heard the testimony of Gilla Rosswaag. After observing her demeanor on the stand and assessing her sworn statements, we found her to be a credible and accurate witness. Ms. Rosswaag set forth that she and her sister Susan Lodato had been involved in a lawsuit with Nanette Stanya concerning Skippers that was resolved via a stipulation before the Hon. Gerald Garguilo. This stipulation provided that the dispute between Mmes. Rosswaag, Lodato and Stanya was to come to an end-conditioned upon the sum of $560,000 being paid to Ms. Stanya to "buy out" her 1/3rd ownership interest in Skippers. Ms. Rosswaag informed the Court that she [*5]approached her daughter (Mia) for the loan of Rosswaag's half of the settlement amount. The reason that she asked Mia for the loan was based on her belief that Mia was in "comfortable" financial circumstances and could procure the sum without resort to a banking institution. Ms. Rosswaag called Mia who ultimately agreed to provide the money in question. Ms. Rosswaag described the meeting between her daughter and herself, which took place at the Rosswaag home. Ms. Rosswaag indicated that she never read the agreement prior to signing it and that Mia told her it was a loan with 4.5% interest. Gilla also said that if Mia had been unable to get the money for her, Ms. Lodato had indicated she would loan her the necessary funds. 
As to the counterclaim/third-party action, Ms. Rosswaag told the court that the plaintiff/counterclaim defendant Mia and Joel Christianson had stayed at Skippers for several years and had not paid rent for a cottage and two motel rooms. The rental for the cottage was $7,000 per summer and the motel rooms were $15,000 each per summer. She said that the counterclaim defendants had stopped paying rent in 2017 and that Joel Christianson had not maintained the premises in lieu of rent. On cross-examination, Ms. Rosswaag admitted that she never sent Mia a bill for the rentals. She also related that Joel became certified through the County to maintain the swimming pool at Skippers. Joel was never paid for this service. He also purchased pool chemicals for a number of years.
Mr. Fallon also read part of Joel Christianson's deposition from October 15th, 2021 into the record (CPLR 3117). The deposition of the younger Mr. Christianson set forth that he was aware of the rental cost of a motel room and cottage at Skippers' (between $2000-$3000 and $5000 respectively) per season. Going back from 2014 through 2018 he paid rent at some time but lacked a specific recall as to when. He also indicated that there had been a discussion of purchasing the property.
The defendant Susan Lodato also testified. She stated that she was unaware of the Agreement and never agreed to any of its terms. She also said that when the lawsuit was settled before Justice Garguilo, she offered to loan the necessary funds to her sister, but that Gilla indicated she would obtain the money from the plaintiff Mia. She also stated that she never agreed to rent (gratis) the rooms and cottage at Skippers to Mia, Joel or Gilla.
Mr. Fallon then read a portion of Mia Christianson's deposition into the record. She discussed the rental of units at Skippers and the usual price but also stated that her husband Joel Christianson "took care of it". The deposition contains a section indicating Mia's desire to purchase Gilla's share of the locus in quo and her idea of its value.
"Q: When you said you always wanted to buy the property, had you often made her offers prior to 2017 to buy the property?
A: Yes.
Q: And when was the, what were - let's go back from 20—2016, did you offer to buy the property from her?
A: I don't know which date, but yes, every Summer I said of course I want to own it and we'll be here together, and we'll share the property and 
Q: How much was the amount that you offered to buy the property from your mom at that time?
A: She had a contract that I asked for her share, a million dollars, I remember that.
Q: So, did you offer to buy her share for a million dollars?
A: At that point, yes.
Q: And what point was that?
A: I don't remember the year.
Q: Was it in 2015 or '16 or?
A: One of them, 20—1 don't know, '14? I don't know. (See page 34-35 lines 19-19 of her EBT)"
She continued:
"Q: So now, when you made this offer to buy your mother's share for a million dollars, it was to buy her one-third interest?
A: Yes.
Q: And what did your mother say to you about that offer?
A: She wasn't ready to sell.
Q: Was that offer put in writing?
A: Yes.
Q: Do you have that writing?
A: I don't.
Q: Do you know who has that writing?
A: We had a fire, we lost all of our paperwork in 2016 "
Ms. Christianson also admitted that she believed the fair market value of the entire [*6]property in 2017 was $3,000,000. (EBT Transcript page 60 lines 9-21)
Her statements regarding the Agreement and its presentation to her Mother are as follows:
"Q: And that was the first time she had seen those three documents, correct?
A: Yes.
Q: You?
A: No.
Q: You had not discussed the terms of those documents with her previously, had you?
A: No." (EBT Transcript p 61 lines 11-16).
On this rather critical issue, i.e., whether Mia had discussed the option to buy with Gilla, the witness appears to contradict herself.
"Q: Did you tell her [Gilla] that she was signing the option allowing you to purchase the property?
A: Absolutely, yes.
Q: You told her that?
A: Absolutely.
Q: And when did you tell her that?
A: That day.
Q: In that room?
A; Yep, yes.
Q: What did you say to her?
A: Just that I'm so excited and we're getting on the road, it's done. I don't know, we were excited, so was she.
Q: So, you didn't specifically talk about the option to purchase?
A: No, not specifically, no. (EBT Transcript p65 lines 4-20)"
Since Mia Christianson did not offer live testimony at trial, the Court was unable to assess her demeanor to help determine her credibility or lack thereof. 
The sum for the purchase option, $785,485.48, appears to place Mia's testimony at a variance with that of Mr. George Christianson (whom we have already indicated was a credible witness). Mia claimed that she didn't know where that figure came from. Mr. Christianson indicated that he formulated the offer based on information provided from Mia and Joel. 
Joel Christianson also was called to the stand. 
He stated that from 1999 through 2018, he, Mia and their children would stay the summers at Skippers, occupying multiple rooms as well as a cottage. He described the maintenance/repair work he performed at the premises and indicated that he was never billed for rent during their annual stays nor did he ever receive a written demand for rent. Mr. Christianson also averred that he maintenance the pool for an 18-year period without compensation, even purchasing the pool chemicals for which he received partial compensation.
Based upon the forgoing the plaintiff contends that the questions regarding validity of the Agreement have been answered by this Court and the Appellate Division. The sole areas of this controversy that remain to be resolved center on the affirmative defenses to the enforcement of the purchase option and the viability of the third-party claim for back rent. This is not seriously disputed by the defendants and the Court agrees with this position. 
Prior to its analysis of the proof and consideration of counsel's arguments, the Court wishes to thank Mr. Prudenti and Mr. Del Col for the plaintiff as well as Mr. Fallon for the defendants. Their courtesy, professionalism and dedication to their clients were in the best traditions of the Bar.
The Court will first discuss the question of whether the purchase option contained in the Agreement is enforceable. 
Based upon the proof adduced at trial, the plaintiff has proven, by a fair preponderance of the credible evidence, that the party's defendant Gilla Rosswaag signed the Agreement. This is not disputed. That aspect of the Agreement providing for a loan has already been discharged by payment. 
We must now ask whether the purchase option imposes a mandate upon Gilla Rosswaag. If so, she clearly breached the contract since her interest in the subject premises was conveyed to the defendant Skippers Cottages, LLC. The binding nature of the Agreement turns on whether any of the affirmative defenses have been proven, thus barring enforcement of the contract. 
The twelve affirmative defenses alleged in the complaint consist of: fraudulent misrepresentation; a narrative defense of fraudulent misrepresentation; unconscionability; "un-clean hands"; lack of consideration; equitable estoppel; unenforceability as to a non-party (Lodato); undue influence; unenforceability against a non-party (Lodato/Skippers Cottages, [*7]LLC); improper restriction on alienability of title; unjust enrichment and finally; statute of frauds.
Plaintiff claims that none of the affirmative defenses raise a bar to enforcement. As to the defense of "un-clean hands", it is posited that the rule in Ortiz v. Silver's Investors, 165 AD3d 1156 (2d Dept 2018) disposes of its merits. Similarly, "lack of consideration" falls under the rule in Weiner v. McGraw Hill, 57 NY2d 458 (1993) and Alleghany College v. National Chautauqua County Bank, 246 NY 369, 373 (1927). Equitable estoppel, plaintiff argues, is not viable in this matter pursuant to the holding in Matter of Shondel v. Mark, 7 NY3d 320 (2006); Putter v. North Shore University Hospital, 7 NY3d 548 (2008); Ross v. Louis Wise, 8 NY3d 478 (2007) and Simcuski v. Saeli, 44 NY2d, 442 (1998). Likewise, the affirmative defense of unjust enrichment is said to lack merit under the holding in Goldman v. Metro Life Ins. Co., 5 NY3d 561, 572 (2005); Clark-Fitzpatrick, Inc. v. LIRR, 70 NY2d 382, 387 (1987). 
In opposing the defendants claim of unconscionability and duress, plaintiff's Counsel urges the Court to apply the holdings in Rowe v. Great Atlantic and Pacific Tea Co., 46NY2d 62, 68 (1978); Shultz v. 400 Co-op Corp., 292 ADd 16, 20 (1st Dept 2002); Christian v. Christian, 42 NY2d 63, 71; Hume v. U.S., 132 U.S. 406 (1889) Nice v. Combustion Engineering, 193 AD2d 1088, 599 NYS2d 205 (4th Dept 1993)and Horseiniyar v. Alimeri, 48 AD3d 635-636, 852 NYS2d 338 (2d Dept 2008).
Plaintiffs further argue the affirmative defense of duress is specious in light of the holdings in: 805 Third Ave. Co. v. M.W. Realty Associates, 58 NY2d 447, 451 (1983); Regent Partners v. Parr Development, 960 F. Supp 607, 612 (EDNY 1957) affd 131 F3d 131 (2d Circuit 1997); Gubitz v. Security Mutual Life Ins. Co., 262 AD2d 451, 452 (2d Dept 1999); Dufort v. Aetna Ins. Co., 818 F Supp 578, 582 (SDNY 1993); Capelli Enterprises v. F&J Continental Foods, Corp.,16 AD3d 609, (2d Dept 2005); and 110 Sand v. Nassau Land Imp., 7 AD3d 497 (2d Dept 2004).
Finally, plaintiffs assert that the affirmative defense of fraud must fail as a matter of law based on the authority found in N.Y.U. v. Continental Insurance Co., 87 NY2d 308, 318 (1995): Channel Master Corp. v. Aluminum Ltd. Sales, 4 NY2d 403, 407 (1958); Urstadt Biddle Props v. Excelsior Realty, Corp., 65 AD3d 1135 (2d Dept 2009); Stone v. Schultz, 231 AD2d 707, 707-708 (2d Dept 1996); Old Clinton Corp. v. 502 Old Country Rd., 5 AD3d 363, 2d Dept 2004); Chrils v. Nassau County Civil Service, 277 ADd 226 (2d Dept 2000). 
Defense counsel argues that the purchase option is unenforceable for several reasons. Defendants first assert that the Agreement's purchase provision is unconscionable citing to Mayaguez S.A. v. Citigroup, Inc., No. 16 Civ 6788 (PGG), 2018 WL 1587597, at *1 (SDNY Mar. 28, 2018); NML Capital v. Republic of Argentina, 621 F3d 230, 237 (2d Cir 2010); United States v. Martinez, 151 F3d 68, 74 (2d Cir 1998) and King v. Fox, 7 NY3d 181, 191 (2006); Mandel v Liebman, 303 NY 88, 94; Weirfield Holding Corp. v Pless & Seeman, 257 NY 536; Graf v Hope Bldg. Corp., 254 NY 1, 4; Howard v Howard, 122 Vt 27;27 Am Jur 2d, Equity, § 24, at 549-550; cf. 2 Pomeroy's Equity Jurisprudence [4th ed], § 873, p 1804); Christian v. Christian, 42 NY2d 63, 71, 365 NE2d 849 (1977); Matter of State of New York v [*8]Avco Fin. Serv., 50 NY2d 383, 389-390).
Mr. Fallon suggests that the law presumes transactions such as this one between parties in a trusting relationship are presumed void and it is incumbent on the stronger party to "show affirmatively that no deception was practiced, and all was open, fair and understood" (Gugel v. Hiscox, 138 AD 61, 73-74, 122 NYS 557 (2d Dept 1910); Cowee v. Cornell, 75 NY 91, 99; Dolan v. Cummings, 116 App Div 787; affd, without opinion, 193 NY 638), Albany City Savings Inst. v. Burdick, 87 NY 40; Smith v. Smith, 134 id. 62; Wilcox v. American Tel. & Tel. Co., 176 id. 115) Gugel v. Hiscox, 138 A.D. 61, 73-74, 122 NYS 557 (2"* Dept 1910).
In the defendants' capacities as third-party plaintiffs, it is contended that the third-party defendants participated in a scheme to defraud the third-party plaintiffs. They allege that the third-party defendants, if allowed to exercise their Purchase Option, will thereby obtain title to the subject premises for less than the full market value. 
Their respective positions will be discussed.
This case involves the reconciliation of two competing legal principals, both ever viable yet of great antiquity. The first "Pacta sunt servanda"[FN1]
is a bedrock of contract law-"promises must be kept." The second "Pietas erga parentes"[FN2]
"reverence towards one's parents" 'is equally ancient but also finds modern voice. Therefore, these maxims are no longer used as authority. Instead, they serve to illuminate that current doctrines have venerable forbearers. 
It is beyond cavil that "a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms" Lobacz v. Lobacz, 72 AD3d 653, 654, 897 NYS2d 516, 517—18 (2d Dept 2010) quoting Willsey v. Gjuraj, 65 AD3d 1228, 1230, 885 NYS2d 528 quoting Greenfield v. Philles Records, 98 NY2d 562, 569, 750 NYS2d 565, 780 NE2d 166).
In the matter at hand, the Agreement, shorn of its language that offends the Rule Against Perpetuities, is clear, unambiguous, and executed by the parties to be charged with enforcing same. The only factor which stays the Court's hand is the consideration of any defenses to the contract's enforcement. 
An area where the Court will intrude upon the precincts of a contract is where breach of a fiduciary duty is alleged (Rich v. New York Cent. & H.R.R. Co., 42 Sickels382, 87 NY 382, [1882], Mandelblatt v. Devon Stores, Inc., 132 AD2d 162, 521 NYS2d 672 [2d Dept 1987]).
The plaintiffs, for all the eloquence of Mr. Del Col's brief, do not acknowledge that a trusting relationship, more exacting than that of a fiduciary, existed between Mia Christianson and Gilla Rosswaag. This omission is fatal to plaintiffs' argument. As discussed below, the Court's decision turns on this issue. 
The quote of the immortal Cicero, mentioned for historical interest alone, demonstrates that an ancient principle of governing law has a modern counterpart. Mr. Fallon's authority Gugel v. Hiscox, 138 AD 61, 73-74, 122 NYS 557 (2d Dept 1910) et al, stands for the doctrine that the Mother-daughter relationship between Gilla and Mia prevents the Court from treating the execution of the contract as an arm's length transaction. The Court agrees.
"A fiduciary relationship 'exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation" Marmelstein v. Kehillat New Hempstead, 11 NY3d 15, 21, 892 NE2d 375, 378 (2008) citing EBC I, Inc. v. Goldman, Sachs & Co., 5 NY3d 11, 19, 799 NYS2d 170, 832 N.E.2d 26 [2005], quoting Restatement [Second] of Torts § 874, Comment a). The Marmelstein Court held that a fact specific inquiry was required to prove the existence of this relationship (id. at 21).
The Court in Farano v. Stephanelli, 7 AD2d 420, 424, 183 NYS2d 707, 711 (1st Dept 1959) stated that "Such a confidential relationship may exist between parent and child." (id. citing Harrington v. Schiller, 231 NY 278, 132 NE 89; Wood v. Rabe, 96 NY 414; Matter of Wicks' Estate, 7 Misc 2d 407, 160 NYS2d 334). 
A careful reading of applicable caselaw reveals that the Second Department has adopted a more emphatic rule in this respect than the First Department. 
Although they involved the application of a constructive trust, the cases of Djamoos v. Djamoos, 153 AD2d 871, 871, 545 NYS2d 596, 597 (2d Dept 1989), and more recently Fakiris v. Fakiris, 192 AD3d 993, 141 NYS3d 326, 327 (2d Dept 2021) discussed the question of whether a fiduciary relationship grows from the parent child bond. Djamoos, held that "With respect to the first element [i.e., a fiduciary/confidential relationship] the relationship between a parent and child will support the imposition of a constructive trust" (id. at 871). Fakiris v. Fakiris, 192 AD3d 993, 141 NYS3d 326, 327 (2d Dept 2021) stated "There is no dispute that the parties were in a confidential relationship as mother and daughter [cites omitted]" (id. at 993). 
The abovementioned caselaw brings the court to the conclusion that a confidential relationship existed between Mia and Gilla at the time the contract was signed. The Court further observes that the law presumes a mutually beneficial fiduciary duty naturally exists between parents and their children. This presumption is placed on both parent and child from birth. In infancy the duty is demonstrated exclusively by the Mother and Father's tender care for their offspring. In the fullness of time, however, the child's duty of reverence becomes manifest in more tangible acts of devotion. Even the emancipation of adulthood, while extinguishing the filial duty of obedience, unless expressly disavowed, does not sever those mutual bonds of affection and duty which bind the generations. As such, the Court places this transaction under the closest scrutiny, and it does not survive analysis.
The defense of undue influence requires the following elements:
. . . there must be evidence that a defendant's influence amounted to a moral coercion, which restrained independent action and destroyed free agency, or which, by importunity *962 which could not be resisted, constrained the [plaintiff] to do that which was against his [or her] free will and desire, but which he [or she] was unable to refuse or too weak to resist. Hearst v. Hearst, 50 AD3d 959, 961—62, 857 NYS2d 596, 600 (2d Dept 2008). If this case involved strangers, it could not be said that the defendants have met this standard of proof. As the Hearst Court noted, however, "if a confidential relationship exists, the burden is shifted to the beneficiary of the transaction to prove the transaction fair and free from undue influence" id. at 962 citing (Matter of Connelly, 193 AD2d at 603, 597 NYS2d 427; see Matter of Gordon v. Bialystoker Ctr. & Bikur Cholim, 45 NY2d 692, 699, 412 NYS2d 593, 385 NE2d 285).
As discussed above, the defendants have established that a confidential relationship existed between Mother and Daughter. Therefore, it was incumbent upon the plaintiff to prove that the signing of the Agreement was performed within the bounds described in Hearst v Hearst. 
The record is bereft of any indication that Mia, carrying the missive from Mr. Christianson, acted other than solely in that gentleman's interest. Mia's deposition contains an ambivalent, self-contradictory statement as to whether the Agreement was explained to Gilla. 
Mr. Del Col considers Mr. Teckel, the notary who witnessed the Agreement's signature as ". . . the perfect witness . . .". The Court disagrees. The following portion of the transcript was brought to our attention by plaintiffs.
"Q Mr. Teckel, I was asking you about the observations that you had of Mia Christianson and her Mother. In your presence, were they discussing the documents?
A She was straightforward. She was going paragraph by paragraph explaining it to her Mother.
Q And based on your observations, did it appear that the Mother understood the documents?
A Yes." (Trial Transcript at 115-116)
As correctly pointed out by Mr. Fallon, this was an opinion on the part of the witness and cannot be considered by the Court (Giraldez v. City of New York, 214 AD2d 461, 462, 625 NYS2d 517, 518 (1st Dept 1995). Assuming arguendo, that the Court did utilize such testimony, it still fails to provide succor for the plaintiff's cause. Did the "explanation" referred to by Mr. Teckel consist of Mia's deposition transcript description that the documents terms were discussed in toto? Or did the "explanation" mirror Ms. Rosswaag's account of Mia stating that it was exclusively for a loan? Mr. Teckel's testimony sheds no light on this important fact and the Court will not speculate on such an essential utterance. 
The plaintiffs have introduced no proof showing Mia to have counselled her Mother as to the best course for the latter to take and otherwise safeguard Gilla's interest. The evidence worthy of acceptance comes from Ms. Rosswaag. The Court is obliged to find that the purchase option in the Agreement was the product of undue influence and is unenforceable.
The Court will analyze the defense of unconscionability, "As a general proposition, unconscionability . . . requires some showing of an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party" (Baron Assocs., LLC v. Garcia Grp. Enterprises, Inc., 96 AD3d 793, 793, 946 NYS2d 611, 612 (2d Dept 2012) citing Matter of State of New York v. Avco Fin. Serv. of NY, 50 NY2d 383, 389, 429 NYS2d 181, 406 NE2d 1075 [internal quotation marks and citations omitted]; see generally Matter of Friedman, 64 AD2d 70, 84, 407 NYS2d 999). In the case at Bar the Court finds that Gilla did not have a meaningful choice because Mia withheld the terms of the purchase option from her. Moreover, the terms of the purchase option were inherently unreasonable. The provision for Ms. Rosswaag to live at Skippers did not have the approval of Ms. Lodato and was a nullity. The option price was for such a significant discount as to give additional credence to Gilla's statement that her daughter did not reveal it to her. Although it has been established that the offending clause was in writing, given the representations by her daughter, it is reasonable under these circumstances that Gilla did not read the document which was at a variance with Mia's verbal representations.
We find that Mia violated her duty to her Mother by failing to advise her of the disadvantage of borrowing the funds from Mr. Christianson because the terms also required a deeply discounted obligation for a right of first refusal. More troubling, the Court also finds that Mia concealed the purchase option from her Mother. It is understandable from Gilla's point of view that reading the document was unnecessary. The emissary who brought it was, after all, her own Daughter. In short, Gilla's guard was down. Under the circumstance herein, it was incumbent on Mia to demonstrate that she had specifically informed Gilla that she was representing Mr. Christianson alone and that her Mother could not consider her as being in a position of trust vis-à-vis reviewing the document that Gilla signed.
As noted above, the plaintiff does not address the special relationship between Mia and Gilla. WBXB's argument is predicated on the Agreement being negotiated as an arm's length business transaction. This is a flaw in an otherwise exemplary post trial brief. Had George Christianson negotiated directly with Gilla, the contract, with the purchase option, would be enforced. He chose as his agent, however, a person (Mia) who already had a fiduciary duty towards the proposed obligor (Gilla). Mia's position was untenable because it was her duty to advise her Mother of the most advantageous way for that lady to proceed. Based on the evidence presented, that would have been securing a loan from Susan Lodato, not agreeing to alienate her fee hold interest at a significant discount from a known higher value that Mia was aware of. 
It is not necessary to consider the remaining affirmative defenses. 
The Court finally examines the counter claim/ third party action for back rent.
In order to constitute a valid contract, an agreement must contain the essential terms necessary for its enforcement (Chan v. Bay Ridge Park Hill Realty Co., 213 AD2d 467, 469, 623 NYS2d 896, 897 (2d Dept 1995).
It is contended by Ms. Rosswaag et al that over a hundred thousand dollars of "back rent" is due. The Court agrees with Mr. Del Col's characterization of the testimony that ". . . there is confusion amongst all the parties as to who paid what and when." Ms. Lodato was unable to recall when Mia and Joel stopped paying rent (Transcript at 277). From the witness stand, Mr. Joel Christianson testified as to some payments in cash. His payments in kind (i.e., servicing the pool and maintaining same) are difficult to quantify (see Transcript at 299, 350-351). Defense counsel's protestations to the contrary, the fact that neither Ms. Rosswaag nor Ms. Lodato had ever made a demand for past-due rent indicates that Joel's labor was acceptable as consideration in return for lodgings. Moreover, there was no evidence submitted as to an agreement on the schedule of payments. The dearth of proof submitted concerning the length of the agreement is also problematic. Was it an agreement to be negotiated on a monthly or seasonal basis? Was it for a term of years? Since the "understanding" was never memorialized it would be speculation to consider whether the Statute of Frauds bars its viability (See Henry L. Fox Co. v. William Kaufman Org., Ltd., 74 NY2d 136, 542 NE2d 1082 [1989]; Camhi v. Tedesco Realty, LLC, 105 AD3d 795, 962 NYS2d 660 (2d Dept 2013); NY GOL § 5-701).
In the matter at hand there are no ambiguous provisions of the agreement for the Court to interpret (Greenfield v. Philles Recs., Inc., 98 NY2d 562, 780 NE2d 166 [2002]). There are necessary terms (acceptable mode of payment, term of the contract) which are missing entirely. 
The fact that Mr. Joel Christianson delivered his labor without remuneration and the cottages were let without demand for payment gives rise to an argument that an implied-in-fact contract was entered into that labor was the consideration for same. The conduct of the parties certainly appears to manifest consent to this arrangement. An implied-in-fact contract can "arise from a mutual agreement and an intent to promise, when the agreement and promise have simply not been expressed in words" Maas v. Cornell Univ., 94 NY2d 87, 93, 699 NYS2d 716, 721, 721 NE2d 966, 969 (1999) citing 1 Williston, Contracts § 1:5, at 20 [4th ed. 1990]). The [*9]testimony of Mr. Christianson and the lack of essential terms to the purported agreement for back rent, are sufficient for the Court to find that the third-party plaintiffs have failed to prove this claim by a fair preponderance of the credible evidence. As such, the back-rent claim will be dismissed. 
Accordingly, for the reasons set forth above, the Court finds that the purchase option is unenforceable and the cause of action pertaining to same shall be dismissed and the claim for back-rent shall also be dismissed.
Settle order and judgment.
Dated: November 7th, 2024
Riverhead, NY
HON. JAMES HUDSON
Acting Justice of the Supreme Court

Footnotes

Footnote 1:Pacta sunt servanda - Promises Must be Kept. This "basic and it seems universally accepted principle of contract law means, in the civil law, that promises are binding." Richard Hyland, Pacta Sunt Servanda: A Meditation, 34 Va. J. Int'l L. 405, 406 (1994) citing (Dietrich Maskow, Hardship and Force Majeure, 40 Am Jur Comp L 657, 658 (1992). See Pleickhardt v. Lippman, 174 Misc 2d 552, 555, 665 NYS2d 806, 808 (Sup Ct, Suffolk Cty Underwood J. 1997).

Footnote 2:"Pietas erga parentes" "reverence towards one's parents"

On Moral Duties (De Officiis) Marcus Tullius Cicero, De inventione (2.65—66) The term "pietas can also be translated as: piety; dutifulness; affection, love; loyalty; gratitude" (Pocket Oxford Latin Dictionary). The concept of pietas was a central belief in Roman Law and society. Cicero frequently returned to it in his works, and it can also be described as having religious connotations. Pietas erga patriam: ideology and politics in Rome in the early first century BC Piotr Berdowski 2014, in K. Twardowska et al. (eds), Within the Circle of Ancient Ideas and Virtues Studies in Honour of Professor Maria Dzielska, Kraków 2014, 143-159